Filed 8/18/21  In re O.P. CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re O.P. et al., Persons Coming Under the Juvenile Court Law. | B309203 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | Los Angeles County Super. Ct. Nos. 20CCJP01699A, 20CCJP01699B |
| Plaintiff and Respondent, | |
| v. | |
| B.P., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Marguerite D. Downing, Judge.  Affirmed in part and reversed in part.

Robert McLaughlin, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, Christine S. Ton, Deputy County Counsel, for Plaintiff and Respondent.

B.P. (father) appeals the juvenile court's dispositional orders removing his two children from his custody, ordering unmonitored weekday visitation, and requiring random drug testing. We affirm in part and reverse in part.

## BACKGROUND

The Los Angeles County Department of Children and Family Services (DCFS) filed a petition on March 25, 2020, alleging (under Welfare and Institutions Code section 300, subdivisions (a) and (b)(1))[1] that the physical health and safety of four-year-old O.P. and three-year-old M.P. were at risk because of their parents' domestic violence. Father and Chantal H. (mother) had a history of engaging in violent physical altercations in the presence of the children. On February 10, 2020, father grabbed mother by the back of her neck and pushed her to the ground, resulting in a contusion to mother's right eye and abrasions to her knee and hand. Father threw an object that shattered the window of mother's car. Father and mother pushed each other, and father stomped on mother. Father was arrested for intimate partner violence with injury (Pen. Code, § 273.5).

Just before 3:00 a.m. on February 11, 2020, a caller told DCFS mother and father lived on and off in a house in North Hollywood and were going through a divorce. On February 10, mother arrived to exchange the children, and father got upset because she was supposed to exchange them a day earlier. Father walked up to mother's parked car and started throwing things out of the car, and then broke the passenger window. Mother stepped out of the car, and father grabbed her by the back

---

[1]     Unless otherwise noted, all the following statutory references are to the Welfare and Institutions Code.

of the neck and threw her to the ground, causing visible injuries to her face, knees, and hand. One child said she saw father step on mother and kick her. Father had been arrested and was in jail, while mother was staying in a hotel with the children.

When police arrived at the scene on February 10, they found mother and father in the middle of the street with things strewn around them. Mother told the officers the children had been with father for three weeks in Maryland, where he lived most of the time. He and the children had returned to California the day before, but because she worked she could not pick up the children until the next day. When she arrived and texted father to walk the children to her car, he stormed outside and yelled at her. Father shattered mother's front passenger window with an unknown object. Mother yelled at him to leave her alone, and he grabbed her belongings from the car and threw them into the street. The children were in the driveway.

Mother drove around the block and called the police. When she returned, she put the children in the back seat. Father continued to yell and throw her things out of her car. She drove about 10 feet. When she tried to get her purse and belongings from father's hands, he grabbed the back of her neck and pushed her to the ground. She sustained a contusion to her right eye and abrasions on her right knee and right hand. Mother called the police again as father continued to throw her things.

From the back seat of the car, four-year-old O.P. told an officer her mom and dad pushed each other. She saw father push mother and get onto her. Crying, she said "her dad stomped on her mom and he wasn't being nice."

Father told the police he and mother had argued in the past about divorcing. He had been waiting since the night before

3

for her to pick up the children.  When she arrived, he saw his property inside the car, so he grabbed his things and threw them out of the car.  Mother pushed him to get out of the way, because she was angry he was throwing her things as well.  Father hurt his right middle finger when he reached into the car to grab his property through a slightly-open window, which broke by accident.  He did not push mother or put his hands on her.

Mother told the officer that in the past father had threatened to kill her with a firearm and a knife and had tried to strangle or suffocate her.  She had tried to separate, but she did not fear for her safety.

A DCFS social worker went to the North Hollywood house on February 12 and saw broken glass on the sidewalk.  Mother answered the door but did not let the social worker inside.  The social worker saw bruising on her right eye.  Mother explained that when she came to pick up the children, father walked out of the house toward the car.  He was angry and they started to yell at each other.  The children were walking outside.  Father threw things out of mother's car and broke her passenger window.  Father also hit her.  Mother pointed to her right eye and said, "Yeah this is from him," and added she had bruises and scratches on her leg.  Father had been arrested after she called the police.

Mother said she and father had a history of domestic violence.  Asked whether she feared father, she answered: " 'Well yeah.' "  She planned to get a place of her own, and would consider filing for a temporary restraining order.  She understood DCFS would intervene if there was another violent incident.  The children appeared clean, unhurt, and well-groomed.

The social worker called father, who said he was "confused" and wanted to know more about the allegations.  Told it was

domestic violence, father said he would call his lawyer.  He said he was busy, asked the social worker to call him back, and hung up.

Neither mother nor father scheduled an interview with DCFS despite numerous attempts.  Father later called the social worker, denied ever hearing from DFCS, and claimed he did not know what was going on and did not hit or assault mother.

On March 16, 2020, Mother returned the social worker's call.  She and the children had moved into a new place, but she would not give her new address for fear of father (although the social worker told her the address would be confidential).  Mother believed father was in Maryland, and she and the children had no contact with him.  She was unable to get off the lease for the North Hollywood home, and had no time to apply for a restraining order because she worked as a registered nurse, and during the COVID-19 pandemic, the hospital where she worked did not allow time off.  She would do her best to get to court.

On March 20, 2020, the court authorized removal of the children from father, and on March 23, DCFS detained the children from father and released them to mother.  The social worker called father to tell him the children were temporarily removed from his care pending the May 26 detention hearing.  Father expressed frustration, and said he never assaulted mother and the children saw nothing.  A last-minute information reported mother said she worked from 7:00 a.m. to 7:30 p.m.  Father expressed concern that mother was working as an emergency room nurse during the pandemic.

At the March 30, 2020 detention hearing, father's appointed counsel appeared on his behalf; neither mother nor the children appeared.  The trial court found the Indian Child

5

Welfare Act did not apply. Father denied the petition. The court found a prima facie case the children were persons described by section 300, and at the request of DCFS, detained the children from father, released them to mother, and awarded father monitored visitation.

At the arraignment hearing on April 1, the court appointed separate counsel for mother and the children, again made findings removing the children from father, and released the children to mother with monitored visitation for father. On the same day, mother filed a request for a temporary restraining order (TRO) against father, protecting her only. The court granted the TRO, and after a hearing on June 24, 2020, signed a one-year permanent restraining order protecting mother until May 26, 2021 (over father's objection).

1. *Jurisdiction/disposition report (May 2020)*

The May 11 jurisdiction/disposition report stated mother grew up in Maryland and moved to California, where she worked as a registered nurse. She had an older child, Jaylen, who lived with his father in Maryland. Father was a self-employed musician with a total of eight children.

Mother still had not provided her correct address to DCFS. She told the social worker she and father had agreed to split the cost of living, but for the last few months he had not paid. Father had agreed to take the children to Maryland so she could work and catch up on bills. He brought the children back a few weeks later because he was frustrated, leading to the February 2020 domestic violence (which she described in detail).

Father had thrown her phone a couple of times when the children were with the babysitter. Father had also punched her. Mother had reported three or four of at least 10 incidents of

domestic violence in San Joaquin County. She still had a gash on her face from when he pushed her. She never started a fight and would hit him back in self-defense. The children were present at three incidents. The Christmas before the February 2020 incident, father threw something at the stove and broke it. He also broke her tree and her decorations, and damaged her walls.

Father left her after she had a late-term miscarriage in 2018 (at 20 weeks). Mother did not give him information about the miscarriage because he never showed any interest in accompanying her to medical appointments during any of her pregnancies. They reconciled in 2019, and then he went to Maryland and had a car accident. He had used marijuana in the past.

Father told the investigator he married mother in Maryland in 2015, and they split up in 2018. He was bicoastal. The day she told him she was pregnant with M.P., he found out she had a son, Jaylen, who lived with her parents in Maryland. In 2018, when mother was eight months pregnant, father went to a friend's wedding in Saint Lucia. Mother called to tell him the doctors were trying to save the baby, who had been born with the cord wrapped around its neck. When father told her he was coming home, she wouldn't tell him the name of the doctor or the hospital. When he returned to California four days later, mother was back at work and not grieving. He called the police and they said they couldn't do anything. He could not live with her anymore, not knowing what happened to his baby.

Father said mother was a pathological liar. She lied about paying their health insurance after he had a bad car accident in Maryland, and lied about where the children were. In January

7

2020, when he was still in physical therapy, she left the children with him in Maryland, saying she had to work long hours to catch up on the rent. When father brought them back to California in February 2020 she had changed the locks on the house. A locksmith let him in, and when she showed up the next day at 8:00 p.m., they started to argue. The car was full of his things, and when he tried to pull his belongings out she "attacked" by trying to drive off. The car window broke when he tried to pull his hand back out. Mother went inside to get the kids and he saw the trunk was also full of his things. When she came back out she attacked him in front of the kids, pulling his hair and hitting his face, head, and neck. When the police arrived, the children were in the car and he and mother were fighting behind the car.

Father claimed mother attacked him. He weighed 250 pounds and was on crutches, so there was no way he could stomp on her. If he had hit her she would have had blood on her or a busted lip. The police told him that under California law they had to arrest someone. The blood on his hand was from the broken window.

Mother had slapped, hit, and punched father, and once hit him with an umbrella, scarring his forehead. She threw things at him and jumped on him. This never happened in the children's presence. One Christmas he came home at night. The children were not there. Mother refused to tell him where they were and broke the stove with a heavy candle holder during an argument. Father admitted he broke the tree and decorations, but he did not call the police because he trusted the children were safe. There was no restraining order against him in San Joaquin County, and the police there never responded to the home for domestic

violence. (A search of the San Joaquin Police log showed at least 20 calls from the family home.)

A high school friend of father's said he never had issues with anger management or substance abuse. The children were happy with him in Maryland. Father called the friend during the February 2020 incident and told her mother was there "starting stuff." The friend heard arguing, but it wasn't clear. Father claimed mother gave him the gash on his head. He said mother had been far along in a pregnancy, and when he returned from out of town, she was no longer pregnant and he still did not know what happened to the baby. The children were very happy with father, who was definitely a fit parent.

The landlord reported that a neighbor who witnessed the incident was surprised father was arrested, because it was mother who threw items out of the car.

A woman who had been friends with both mother and father for over eight years told DCFS she knew they had relationship issues and disagreements, but was not aware of any physical altercations. Mother used the children as collateral by restricting father's contact. She knew mother loved the children, but they had more stability with father and always preferred being with him.

Mother wanted the children to live with her, with monitored visitation for father. Father wanted a divorce and joint legal and physical custody.

DCFS, concerned about mother's "semi-cooperative stance," recommended the court order mother to provide the children's current address, sustain the petition, declare the children dependents, and provide mother with family maintenance. The children should be removed from father, who should receive

monitored visitation. Father should be required to enroll in individual counseling and a parenting program, and to engage in therapy with the children if their therapist deemed it appropriate. DCFS requested authority to release the children to both parents.

A last-minute information attached police records from San Joaquin County. In July 2017, mother called the police and asked to meet at the local high school. She told the officer she had a verbal argument with father, but refused to provide more detail. Mother had no visible injuries and insisted the police not speak to father. In May 2018 mother told the police father punched her in the jaw twice during an argument over watching the children. Mother said he had been out drinking and she was very afraid of him, especially when he was drunk. She had a small laceration and swelling on her upper lip, and received a week-long emergency protective order. In October 2018 father called the police to help him find mother, who had called to tell him she miscarried. He was afraid she had done something to the baby. Mother was at work and had communicated with father by text. The officers advised father to call again if he thought any suspicious activity had occurred, but he did not request further assistance.

### 2. *Subsequent proceedings*

Father filed a walk-on request on August 21, 2020, because mother had not provided regular visitation and took the children to Maryland without notifying the court or DCFS. The court ordered DCFS to prepare an update on father's visitation, and ordered mother to comply with the visitation order.

In last-minute informations dated September 11 and 23, father stated he now had unmonitored overnight visits three

days a week, and would fly to California to spend the visits in his newly-rented apartment. Father said mother was often late to the drop-off point at the local police station, but mother denied this. The children appeared comfortable in father's presence, the visits went very well, and they were sad to leave. They were happy to see mother too. When mother asked O.P. if she had a good time with father and she said no, mother then asked O.P. if she told the social worker. Yet O.P. told the social worker she had a great time with father.

Mother would not allow the social worker to visit the children inside the home because of the pandemic; they would talk to the social worker outside on the stairs. The children said mother's 10-year-old son Jaylen (who reportedly had developmental delays) had recently moved in, and sometimes she left the smaller children alone with him when she went to work. M.P. had a cut on his leg and said Jaylen stabbed him with a knife. Mother said Jaylen had stayed with them for a month and had gone back to Maryland.

Mother reported father had cancelled or modified some visits, and father said mother was 30 minutes to three hours late to exchange the children. Mother reported father had used marijuana in the past, usually outside. Although father had denied any past or current use of marijuana, the social worker smelled marijuana in father's home. When questioned, father said he had a medical marijuana recommendation (for pain management after his car accident). He did not smoke when the children were under his care or in their presence, kept the marijuana out of their reach (the social worker verified this), and had no drug-related arrests. He agreed to test the next day, and DCFS recommended the court order father drug test and not care

11

for or drive the children when he was under the influence. The social worker noted the children were comfortable with both parents (when father and mother were not together). Father's visits had gone very well and DCFS had liberalized the visits to unmonitored overnights. Although mother had initially said she did not want DCFS to enter her home because of COVID-19 and clutter, she now stated she would allow DCFS entry. Father complained mother cancelled some of his visits, but mother explained she requested he quarantine for 14 days after he attended a large gathering in New York.

Another last-minute information filed November 17 changed DCFS's recommendation. The parents no longer lived together and the children disclosed no abuse. Other contacts expressed no concerns about their safety in father's care. When the visits were monitored, the social worker observed the children were excited, happy, and showed no distress. Father had a good support system in his parents and siblings in Maryland. DCFS had liberalized father's visits to unmonitored and then to overnight, so that father now picked the children up at 3 p.m. on Sundays and returned them to mother at 10 a.m. on Wednesdays. For two months, the parents had cooperated and honored the visitation schedule, and both allowed DCFS to visit inside their homes with no issues. Jaylen was back in Maryland and mother said she worked only when the children were staying with father. Both were seeking programs to address the case-related issues and had no intention to reconcile.

DCFS recommended the court release the children to both parents in separate households, and offer family maintenance services to both. Father should be ordered to enroll and participate in individual counseling, parenting classes,

anger management and domestic violence classes. DCFS also recommended father participate in random drug tests, show decreasing levels of marijuana, and not use marijuana when caring for the children. Mother should be ordered to participate in individual counseling, parenting classes, anger management and domestic violence classes, to enroll the children in age-appropriate counseling and engage in therapy with the children if their therapist deemed it appropriate, and not allow the children to be alone with Jaylen.

### 3. *Adjudication/disposition hearing*

The juvenile court continued the hearing to November 19, 2020, to allow counsel to review body cam footage supplied by the police and order transcription if necessary.

At the hearing, minors' counsel requested the court sustain the allegations. Mother and father told different versions of the events in February outside the North Hollywood home, but O.P. said father stomped on mother. Mother said she had reported only three or four of over 10 incidents of father's domestic violence. Father said mother was the aggressor. The February 2020 domestic violence occurred while the parents were separated, so the risk of domestic violence continued. Minors' counsel did not ask that the children be detained from father. But because father had accepted no responsibility and seemed not to have insight into the risk of harm to the children, minors' counsel requested the petition be sustained with visitation remaining as DCFS had liberalized it (unmonitored and overnight).

Mother pleaded no contest to the petition.

Father's counsel objected to sustaining the petition, arguing there was insufficient evidence of current risk. The

13

parents lived separately and a restraining order was in place. The statements of mother's witnesses and the police report lacked any credibility. Mother had been the instigator (getting out of the car and pushing and hitting father), but the police had left this out of the report and had treated father differently simply because he was male (as had DCFS). Mother's relatively minor injuries were inconsistent with father's size and strength. The body cam footage contradicted the report and showed mother was not a passive victim that day. And mother had prevented DCFS and minors' counsel from seeing the children, by lying about her location. Father's counsel objected to removal from father and any orders that he participate in domestic violence classes. Counsel also objected to individual counseling and parenting classes (although father would comply if necessary for release of the children to him), and objected insufficient evidence supported drug testing or programs.

DCFS asked the court to sustain the petition and joined in the argument of minors' counsel. The police report incorporated the neighbors' statements and summarized the body cam transcription, in which O.P. reported father stomped on mother.[2] Breaking mother's car window took a lot of force. This occurred

---

[2] In the transcription, father denied hitting mother, but the police said she had injuries consistent with her account that he hit her. Father said he was injured too, but the police said his injuries were to his finger, consistent with breaking her window, and he was the dominant aggressor. O.P. told the officer she was in the car crying and her parents were pushing and hitting each other. Father pushed mother and she fell, and then he stomped her. Mother told the police there had been three prior reported incidents of domestic violence in San Joaquin County.

14

during an exchange of the children while the parents were separated, when father was upset that mother was late to pick up the children. There had been previous domestic violence, and the children were present at the latest incident.

The court sustained the petition as amended to state in a-1 that only father had a history of engaging in violent physical altercations with mother in the children's presence, and sustained b-1 as alleged. The court asked if father was enrolled in any programs, and counsel answered he had enrolled in anger management a month earlier. The court expressed surprise father had delayed for so long after the petition was filed eight months earlier. The court removed the children from father's custody and placed them in mother's home, ruling mother retained physical custody.

The juvenile court noted father had not accepted any responsibility. "Even if mother is somewhat responsible, she has resolved the case. She didn't break a window. She didn't throw items out of the car. But [father] did. The children even say Daddy was not nice to Mom . . . . Even if I just look at that, I [have] a problem with this man having unmonitored visitation because obviously he has an anger management issue he can't control. So his visits will remain unmonitored days. But he no longer has overnights and weekends." When counsel stated father wanted to address the court, the court refused: "He is the person who did not want to settle this case because he has a criminal case. So if he starts talking, now, that can be used against him in the criminal court."

The court ordered enhancement services for father (domestic violence and parenting classes, individual counseling, and joint counseling with children when the children's therapist

15

agreed).  The court also ordered random drug testing every other week (but no program), with father not to use marijuana when the children were in his care, and required his tests to show declining levels.  Father had unmonitored day visitation but no overnight and weekend visits.  DCFS did not have discretion to liberalize, "because I have no way to control whether you're going to make [father] engage in program or just let him have unmonitored visitation without doing anything."  Father's counsel objected to the "deliberalization" of visitation to unmonitored days only and to joint counseling because father's case plan was "very, very full at the moment."  The court responded: "[I]t is a cycle.  He does not want his daughter[ ] to believe she can be kicked when she becomes a grown woman and is with a man.  So he might want to engage and talk about how Daddy made a mistake."  Father "would have done better had he gotten into programming in the seven months since this case was filed."  Father's counsel agreed father did not settle because of the criminal matter, and the court repeated that father could have admitted partial responsibility and participated in programs.  "I'm just hearing it was not him.  He didn't do anything."

Father filed this timely appeal.

## DISCUSSION

1. ***Substantial evidence supported removal from father***[3]

Under section 361, subdivision (c)(1), the juvenile court may remove a child from a parent's physical custody if the "court

---

[3]    Because DCFS did not recommend removal from father or recommend a change to his overnight visits, DCFS does not take a position on father's appellate challenge to the removal and visitation orders.

16

finds clear and convincing evidence [that] (1) There is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's [parents]. . . ." Unless the child is adjudicated a dependent because of severe abuse under section 300, subdivision (e) (which is not the case here), a jurisdictional finding alone is not prima facie evidence the child cannot remain in the parent's physical custody. (*In re E.E.* (2020) 49 Cal.App.5th 195, 218.) In determining whether to remove the child, the court may consider the parent's past conduct and current circumstances, as well as the parent's response to the conditions that caused the juvenile court to intervene. (*In re D.B.* (2018) 26 Cal.App.5th 320, 332.) The parent need not be dangerous, and the child need not have suffered actual harm, before removal is appropriate. (*Id.* at p. 328.)

The standard is clear and convincing evidence, and the juvenile court " 'is in the best position to determine the degree to which a child is at risk based on an assessment of all the relevant factors in each case.' " (*In re E.E.*, *supra*, 49 Cal.App.5th at p. 217.) The court must determine whether reasonable efforts were made to prevent or eliminate the need for removal of the child from the home. (§ 361, subd. (e).)

"When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true. In conducting its review, the court must view the record in the light most favorable to the

prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011-1012.)

Father left mother visibly injured after a physical altercation observed by then-four-year-old O.P. and then-three-year-old M.P. Although father and mother hit and pushed each other, father broke mother's car window and pushed her to the ground, and as described by O.P., father "stomped" on mother. Mother had reported domestic violence by father at least once before, and stated there were other incidents she did not report. A reasonable fact finder could have concluded it was highly probable father repeatedly engaged in domestic violence against mother, culminating with father's arrest in February 2020 and the issuance of a restraining order.

Father argues he and mother "broke the cycle of violence and established their ability to successfully share custody of [O.P. and M.P.]." But father did not show he addressed his anger issues. Instead, he denied hitting mother, asserted she was the aggressor, and waited to enroll in anger management classes until just a month before the disposition hearing. He continued to deny any responsibility for the domestic violence. (See *In re T.V.* (2013) 217 Cal.App.4th 126, 136-137.) "The inference from his denial is that he is less likely to change his behavior in the future." (*In re V.L.* (2020) 54 Cal.App.5th 147, 156.) The children were exposed to domestic violence in February 2020 (and, according to mother, during three previous incidents), and "the last incident precipitated the current dependency case." (*Ibid*.) Further, at the time of the adjudication hearing, the one-year

18

restraining order protecting mother was still in place and apparently exchange of the children had been taking place at the local police station; under these circumstances, father can hardly take credit for not being violent against mother. Viewing the evidence in the light most favorable to the order, and deferring to the trial court's evaluation of the record before it and its credibility determinations, we hold substantial evidence supported the conclusion the children remained at risk from domestic violence.

Finally, substantial evidence supports the conclusion there were no reasonable means of protecting the children without removing them from father. As outlined above, father was initially evasive and uncooperative with DCFS, failed to acknowledge any responsibility for the domestic violence, and only belatedly participated in programs meant to address the violence. Because (contrary to father's assertion) substantial evidence supports the conclusion the cycle of domestic violence between father and mother was unresolved, no reasonable means of protecting the children existed other than removal. (*In re Nathan E.* (2021) 61 Cal.App.5th 114, 124.)

## 2. *The visitation order was not an abuse of discretion*

We review for abuse of discretion the court's order setting the terms of visitation, and "will not disturb the order unless the trial court made an arbitrary, capricious, or patently absurd determination." (*In re Brittany C.* (2011) 191 Cal.App.4th 1343, 1356.)

Father argues the court abused its discretion when it ordered unmonitored day visitation during the week, after DCFS two months earlier had liberalized his visitation to unmonitored

19

overnight and weekend visitation (Sunday afternoon to Wednesday morning). We see no abuse of discretion.

First, father argues the court's order significantly reduced his contact with the children. But the court's order did not reduce the frequency or amount of visitation. Under the order allowing unmonitored weekday visitation, father could visit with the children five days a week, which is more than the previous schedule. He does not explain how it was an abuse of discretion not to allow overnight visitation. Second, the ordered visitation remained unmonitored, consistent with DCFS's former liberalization.

Father argues it was unlawful to delegate to him and to mother the frequency and duration of his visitation. He did not object to the order on that basis. Even if he did not forfeit this objection on appeal, he has not shown the court acted improperly. "[T]he juvenile court cannot delegate the decision whether visitation will occur to any third party, including the child, the social services agency, or the guardian." (*In re Korbin Z.* (2016) 3 Cal.App.5th 511, 516.) "A visitation order may delegate to a third party the responsibility for managing the details of visits, including their time, place and manner," but may not "delegate discretion to determine whether visitation will occur, as opposed to simply the management of the details." (*In re T.H.* (2010) 190 Cal.App.4th 1119, 1123.) Here the court delegated to the parents the discretion to determine during which weekdays the visitation will occur. This is not an unlawful delegation of whether visitation will occur at all.

3.    ***The drug testing order was an abuse of discretion***

Father argues the trial court abused its discretion when it required him to submit to random drug testing. We agree.

20

"Section 362, subdivision (d) authorizes the juvenile court to 'direct any reasonable orders to the parents' of a dependent child as the court deems necessary and proper to ensure appropriate care, supervision, custody, conduct, maintenance, and support of the child (§ 362, subd. (d)), and the juvenile court enjoys broad discretion in crafting a dispositional case plan to this end." (*In re I.R.* (2021) 61 Cal.App.5th 510, 522.) But the juvenile court "cannot arbitrarily order services that are 'not reasonably designed' to eliminate the behavior or circumstances that led to the court taking jurisdiction of the child." (*In re M.R.* (2020) 48 Cal.App.5th 412, 424.)

Father's use of medical marijuana is entirely unrelated to the domestic violence described in the sustained allegations. And the use of medical marijuana, without more, does not support dependency jurisdiction. (*In re Natalie A.* (2015) 243 Cal.App.4th 178, 185; *In re Drake M.* (2012) 211 Cal.App.4th 754, 764.) The only other evidence of father's use is mother's statement that father had smoked marijuana in the past, usually outside the house. An order for drug testing is called for if any rational trier of fact could conclude the order advanced the children's best interests. (*Natalie A*, at p. 187.) Here there is no evidence that father *abused* marijuana or that his use posed a substantial risk to the children.[4] There was no evidence that father used marijuana in front of the children, and DCFS verified

---

[4] DCFS argues mother reported in 2018 that father hit her after he had been drinking and that she was especially afraid of him when he was drunk. But no evidence showed father was abusing alcohol in 2020 or alcohol played a part in the domestic violence giving rise to the petition, and the court did not mention father's use of alcohol.

that he stored his medical marijuana out of their reach.  On this record, the trial court could not reasonably conclude that drug testing was necessary to eliminate the conditions that led to the children's dependency status.  (*Ibid.*)

## DISPOSITION

The disposition order of the juvenile court is reversed to the extent it orders father to participate in random drug testing. In all other respects, the disposition order is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EGERTON, J.

We concur:

EDMON, P. J.

LAVIN. J.

22